IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | 1:15cr301 |
| ) | |
| ROSCOE ORTEGA UMALI ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

This matter is before the Court on Defendant Roscoe Umali's ("Defendant") Motion to Reconsider Detention [Dkt. 53] and his Supplemental Motion for Reconsideration [Dkt. 95]. For the reasons set forth below, the Defendant's Motions are denied.

**I. Background**

On November 4, 2015, the Defendant was arrested on charges of wire fraud and conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343. On November 5, 2015, Magistrate Judge Douglas F. McCormick of the Central District of California entered an order releasing the Defendant on conditions pending trial. Upon motion by the Government pursuant to 18 U.S.C. § 3145, this Court heard a *de novo* review of the Magistrate Judge's order on November 19, 2015. On November 23, 2015, this Court entered an order with an accompanying memorandum opinion granting the Government's motion and ordering the Defendant detained without bail pending trial. (Order of Nov. 23, 2015

1

[Dkt. 49]; Mem. Op. [Dkt. 51])

On November 24, 2015, the Defendant filed this Motion to Reconsider Detention.  The Government voiced their opposition to the Defendant's Motion to Reconsider Detention at an arraignment hearing on December 10, 2015, and the Court requested further briefing on the matter.  The Government filed their opposition to the Motion on December 11, 2015 [Dkt. 91].  On December 17, 2015 the Defendant filed a Supplemental Motion for Reconsideration [Dkt. 95].  The Government filed a response to the Defendant's supplemental brief that same day [Dkt. 96].  The Motions are now ripe for decision.

## II. Analysis

The Defendant's arguments against his continued pretrial detention fall into three categories.  First, the Defendant contends that this Court's previous Memorandum Opinion erred by determining that, given the nature and circumstances of the offense charged, the weight of the evidence against the Defendant, and the history and characteristics of the Defendant, the preponderance of the evidence demonstrated that no combination of conditions would reasonably assure the Court of the Defendant's appearance at future court proceedings.  (Def.'s Mot. to Rec. ¶¶ 1, 2, 5, 6.)  Second, the Defendant challenges the reliability of the evidence presented by the Government at his initial detention hearing.  (Id. at ¶¶ 2, 3.)  Finally, the

2

Defendant argues that new evidence regarding the nature and timing of his trip to the Philippines in 2015 demonstrates that he is likely to return to face further proceedings without pretrial detention. (Id. at ¶ 4.) The Court will address each of these arguments in turn.

1) <u>The Court Considered All Possible Pretrial Conditions in Issuing the Original Detention Order</u>

The Court stands by the findings in its previous Memorandum Opinion that because the offense charged involved the careful concealment of the defendant's identity through the use of false identities and at least one fraudulent government identification card, "the Defendant has demonstrated skill at assuming false identities and evading detection." (Mem. Op. at 8.) The Court also stands by its previous determination that the Government has demonstrated, by a preponderance of the evidence, that their case against the Defendant is substantial. The Court found the testimony of agent Erich Schulenberg credible in this regard. Further, while the Court did not list every possible condition which can be imposed during pretrial release, it did consider each of them, and explicitly found by a preponderance of the evidence that "no combination of conditions will reasonably assure the Defendant's appearance at future court proceedings." (Id.) For the benefit of the parties, however, the Court will now further clarify why it finds that

3

the three potential conditions specifically proposed by the Defendant in his Motion to Reconsider are insufficient to reasonably assure the Defendant's appearance at further court proceedings.

  The Court finds that given the evidence of the Defendant's previous acquisition and use of false government identification documents, surrender of his Philippine passport would not eradicate concerns about flight to another country. The prior use of false government issued identification indicates both that the Defendant possesses the know-how to obtain false government issued identification again and that the Defendant is willing and able to use false government issued identifying documents to conduct business under an assumed identity. While the surrender of the Defendant's Philippine passport would prevent the Defendant from using that passport to flee the country, it would do nothing to address concerns about the Defendant's ability to fraudulently obtain another, false passport.

  The Defendant also suggests third party custodianship by his mother. However, third party custodianship by a family member in this case is particularly problematic, as the Defendant has extensive familial ties to the Philippines, and that family network could be used to facilitate flight. The Defendant himself has admitted that after the initiation of the

4

investigation in this matter and prior to his arrest, he was visiting his grandmother in the Philippines. (Def.'s Mot. to Rec. ¶ 4.) The Defendant's extensive family ties to the Philippines and the timing of his most recent trip there strongly suggest that if the Defendant were to flee the country, the Philippines would be one of his most likely destinations. This Court has previously determined that the circumstances of this case demonstrate that the Defendant has a strong incentive to flee the country and the willingness and know-how to do so. The Court does not believe that a third party custodianship will help assure the Defendant's appearance at further proceedings, particularly when the third party custodian is a member of the family network which provides the Defendant with one of his most likely avenues of flight.

    Finally, the Defendant proposes electronic monitoring, with the unsupported assertion that "this also would virtually make any ability to flee almost non-existent." (Def.'s Mot. to Rec. ¶ 5.) Obviously if the imposition of electronic monitoring were enough to "make any ability to flee almost non-existent," than no defendant would ever be detained pending trial as a flight risk. The Defendant overstates the effectiveness of electronic monitoring. Electronic monitoring is not always effective in preventing flight. *See, U.S. v. Hussain*, 6 Fed.App'x. 50, 52 (1st Cir. 2001); *U.S. v. Minns*, 863 F.Supp.

5

360, 364 (N.D. Tex. 1994); *U.S. v. Patel*, 1995 WL 557379, at *3 (N.D. Ill. Sep. 19, 1995).  In light of the Defendant's strong incentive to flee, his extensive connections abroad, and his experience with concealing his identity, the Court finds that electronic monitoring would not reasonably assure the Defendant's appearance at further proceedings, either alone or in conjunction with any other conditions of release.

      2) <u>Reliability of the Government's Evidence</u>

The Defendant also argues that the testimony presented by the Government at the detention hearing was not sufficiently reliable to justify the Court's finding that "the weight of the evidence against the defendant appears to be substantial." (Mem. Op. at 7.)  Specifically, the Defendant takes issue with the Court's consideration of "the evidence of a cooperating witness."  (Def.'s Mot to Rec. ¶ 2.)  The Defendant further argues that "[t]he court in its opinion says the case 'appears' substantial without any factual basis as stated above." (Id.)  The defendant's objection to the consideration of cooperating witness testimony is baseless.  First, the Court is entitled to consider any evidence, even that which might be inadmissible at trial, in a bond hearing.  *See* Fed. Rule Evid. 1101(d)(3)(Rules of Evidence do not apply when "considering whether to release on bail or otherwise").  Second, even at trial there is no rule against the admissibility or consideration of testimony by

6

cooperating witnesses.

The Defendant argues that "the reliability of this type of evidence is very suspect." (Def.'s Mot. to Rec. ¶ 2.) While cooperator testimony can be vulnerable to impeachment based on the potential self-serving motivation of the cooperator, the Defendant grossly overstates his case by arguing that cooperator testimony is inherently "very suspect" or of little value to the government's case. Cooperator testimony can be hugely influential in a prosecution case particularly where, as here, the cooperator testimony is corroborated by other, concrete sources.[1]

In any event, the relevant inquiry at a detention hearing is not whether the Government can prove the offense charged, but rather the extent to which the weight of the Government's evidence creates an incentive for the defendant to flee rather than return for further proceedings. The Court finds that the prospect of cooperator testimony against the Defendant corroborated and bolstered by extensive evidence in the form of financial records, phone records, and text messages creates a strong incentive to flee rather than return to face further proceedings in this case. Accordingly, the Court stands

---

[1] The Court found the testimony of agent Erich Schulenberg to be credible in this regard, and believes his assertion that the cooperating witnesses' testimony is corroborated by financial and telephone records.

7

by its initial determination that the "extensive evidence against the defendant increases the temptation to flee rather than return for subsequent proceedings in this court, and weighs in favor of detention." (Mem. Op. at 6.)

### 3. New Evidence Regarding Travel to the Philippines

The Defendant argues that the Court "misstated the facts as to the defendant's trip to the Philippines" in its previous Memorandum Opinion. (Def.'s Mot. to Rec. ¶ 4.) However, the Court's prior opinion and order did not rest on a finding or belief that the Defendant returned from the Philippines prior to the *arrest* of his alleged co-conspirators Ayala and Sanchez. Rather, the Court looked to the Government's evidence that the Defendant returned to the United States "only after having communicated with Ayala and Sanchez via a 'facetime' application and confirming that they had fled the United States to Mexico." (Mem. Op. at 7.) The Defendant has not introduced any evidence or testimony indicating that he then discovered that Ayala and Sanchez had returned to the United States and been arrested. The Court finds that a preponderance of the evidence indicates that the Defendant returned from the Philippines after confirming that Ayala and Sanchez had fled to Mexico, but before learning that Ayala and Sanchez had eventually been arrested.

The fact that the Defendant made his most recent trip

8

to the Philippines by the usual, legal means does not diminish the persuasiveness of the trip's extremely suspicious timing. The Defendant's passport demonstrates that he entered the Philippines on June 15, 2014, less than a week after search warrants were executed at the residence of his alleged co-conspirators, Sanchez and Ayala.[2] (Def.'s Ex. 1 [Dkt. 95-1].) The dates of the Defendant's passport stamps suggest that upon learning of the Government's investigation, the Defendant's first instinct was to flee the country.

The return date on the Defendant's passport appears to demonstrate that he in fact returned to the United States well before his alleged co-conspirators Sanchez and Ayala were arrested in the Spring of 2015. *See United States v. Sanchez et al.*, No. 1:15cr147 (E.D. Va.) at Dkt. No. 9 (arrest warrant returned executed for Sanchez on March 23, 2015); *id.*, Dkt. No. 18 (arrest warrant returned executed for Ayala on May 24, 2015). As discussed above, the Court did not rest its prior order on the belief that the Defendant returned to the country before Sanchez and Ayala were arrested, only that the Defendant returned to the country prior to discovering their arrest. However, it is somewhat troubling to see the Defendant asserting in one breath that he "returned <u>after</u> the co-defendant's (sic)

---

[2] Search warrants were executed on the residence of Joshua Sanchez and Kristen Ayala on or about June 9, 2014. (Gov.'s Resp. to Def.'s Supp. Mot. [Dkt. 96] ¶ 3.)

9

were already arrested and in custody", then turning around and introducing evidence demonstrating that he returned well before Sanchez and Ayala were arrested with the next. (Def.'s Mot. to Rec. ¶ 4. (emphasis in original))

The new evidence introduced by the Defendant only bolsters the Court's previous finding that the Defendant's "past actions demonstrate a willingness to endorse flight rather than face court proceedings on the Government's charges." (Mem. Op. at 7.) Neither the Defendant's newly introduced evidence nor their arguments have persuaded the Court that any condition or combination of conditions could provide reasonable assurance ensure the Defendant's appearance at subsequent proceedings. Where no condition or combination of conditions can reasonably assure the court of the defendant's appearance, pretrial detention is warranted. *United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001). Accordingly, the Court still finds by a preponderance of the evidence that pretrial detention is appropriate in this case.

### III. Conclusion

For the foregoing reasons, the Court denies both the Defendant's Motion to Reconsider Detention and his Supplemental

Motion for Reconsideration.

    An appropriate Order shall issue.

                                                  /s/

January 27, 2016                James C. Cacheris
Alexandria, Virginia    UNITED STATES DISTRICT COURT JUDGE